### MAUGERI v. UNITED STATES. *
### No. 7901.

Circuit Court of Appeals, Ninth Circuit.

Nov. 21, 1935.

WILBUR, Circuit Judge, dissenting.

———◆———

*Rehearing denied Jan. 13, 1936.

Charles H. Brennan and Edmund J. Dunning, both of San Francisco, Cal., for appellant.

H. H. McPike, U. S. Atty., and Robert L. McWilliams and V. C. Hammack, Asst. U. S. Attys., all of San Francisco, Cal., for the United States.

Before WILBUR, GARRECHT, and HANEY, Circuit Judges.

GARRECHT, Circuit Judge.

The indictment in this case charges three defendants, Gaspare La Rosa, Salvatore Maugeri, and Jimmie Pasqua (true name Frank Scarpatura), in twelve substantive counts, with the possession and the passing of falsely made, forged, and counterfeited obligations and securities of the United States, namely, forged and counterfeited Federal Reserve Notes of the Federal Reserve Bank of New York.

A thirteenth count, which is the only one involved in this appeal, charges the three defendants with conspiracy to commit offenses against the laws of the United States, to wit, to keep in their possession and conceal, and to pass, utter, etc., and attempt to pass, utter, etc., with intent to defraud, etc., counterfeited notes, and that thereafter one or more of the defendants, mentioned by name, performed eight overt acts to effect the object of the conspiracy.

La Rosa pleaded guilty to all thirteen counts of the indictment. Counts 3, 4, 7, 8, 11, and 12 were ordered dismissed by the court as against the appellant and Pasqua, on motion of the United States Attorney. Counts 1, 2, 5, 6, 9, 10, and 13 were submitted to the jury as against the appellant and Pasqua. The latter was found guilty on all counts submitted to the jury. The appellant was found guilty only on count 13, the conspiracy count, and not guilty on all the other counts submitted to the jury.

From a judgment and order made by the court below, sentencing the appellant to a term of two years in a United States penitentiary, and assessing a fine of $5,-000, the present appeal has been brought before this court.

Motions for a directed verdict were made at the close of the government's case, and again at the close of all the testimony.

While there are four specifications of error, the appellant's main attack upon the judgment of the court below is based upon the refusal of the trial judge to grant the motions for a directed verdict.

Since it is urged that the evidence is insufficient as a matter of law to support a verdict of guilty against the appellant, we here give a brief narrative of the testimony disclosed by the record.

Appellant's two codefendants, Pasqua and La Rosa, from September 28 to December 22, 1934, were engaged in passing counterfeit bills. On the 29th day of September, 1934, Pasqua purchased a Hupmobile touring car, which carried license 4J 87 55. This car was used by the two codefendants in their criminal operations, but was abandoned by them three days thereafter under the following circumstances:

On September 29, these same two codefendants went together to a beer parlor in Berkeley and ordered two glasses of beer. The place was very crowded. One of them handed an attendant a $10 bill and told him to get some change. The attendant brought the bill to the manager, who pronounced it a counterfeit. Thereupon said defendants left the place and got into the Hupmobile touring car and the manager took the license number of the car, which was 4J 87 55. He telephoned the number and incident related above to the police station. An officer was sent to the scene where the two defendants had attempted to pass the counterfeit bill, and, after full information was secured, it was broadcast from the Berkeley Police Station. All police cars were notified to be on the lookout for the men and the car of a given description, which included the make of the car and the license number of the Hupmobile heretofore referred to. This automobile was found to have been abandoned in a Berkeley street October 2, 1934, but four or five days after its purchase.

The evidence does not disclose the connection of appellant with the conspiracy until after the abandonment of the Hupmobile touring car a few days subsequent to the police station broadcast describing it.

In order to fully indicate the connection of appellant with the conspiracy, it is necessary to trace some of his activities back to June 1, 1933. On that day appellant, Maugeri, purchased a secondhand Studebaker automobile that was registered in the name of Jim Domenic, nephew of appellant, who gave his address as 155 Lighthouse avenue, Santa Cruz, Cal., of which premises appellant was the owner. On September 11, 1934, this car, carrying 1934 license No. 3J 826, met with an accident and on the same day a wrecking crew took it out of the ocean and delivered it to Domenic at the above address. Later, about November 18, 1934, the man who recovered the wrecked car from the ocean took the wreck for the bill, but at that time it did not have the license plate 3J 826, or any license plates on it at all. On November 17, 1934, appellant, Maugeri, brought an Essex car, which thereafter was repeatedly used in passing the counterfeit money, to an auto repair shop operated by Al Logan, to be fixed. He was accompanied by his codefendant Pasqua. Maugeri was in a hurry to have the car fixed; he said his companion wanted to go on a trip. The car was repaired and appellant paid the bill. Pasqua testified that he did not own the car, but was driving it for appellant. On November 18th this Essex coupé automobile, operated by appellant's codefendants Pasqua and La Rosa, was used when they attempted to pass a $10 bill on a service station operator. At that time this Essex car carried the license plate 3J 826, formerly affixed to the wrecked car previously purchased by appellant.

About four or five days later Pasqua brought the Essex car back to the same repair shop. He said it was not "shooting right." It was tightened up and the next day or day following Pasqua came to the shop and took the car away. On the 23d of November, 1934, this same Essex coupé bearing license No. 3J 826 was used in passing a $10 counterfeit bill on Earl Roberts, a service station operator.

Some time in November appellant, Maugeri, told a certain service station operator that these other defendants were friends of his and that he would send them in and to give them a rate on their gas. Later on, one of these two codefendants, while accompanied by another man that the filling station employee did not clearly see, bought gas with a counterfeit $10 note.

On November 28, 1934, this Essex car, in which were riding defendants Pasqua and La Rosa, stopped at a service station in San Mateo. A tire on the car had a blowout. They inquired of the operator of the station if he could fix the tire for them. The tire could not be fixed and a new tire

was too expensive for them, so they left the car at the station and came back for it two days later.

About noon of the same day, November 28, 1934, government secret service agents saw La Rosa and Maugeri leave the latter's home in a Buick roadster, owned by codefendant Pasqua. La Rosa was driving. They proceeded to a café where both entered. Afterwards they came out, crossed the street and entered a Studebaker sedan belonging to appellant. They drove to the United Tire Company, where appellant bought an automobile tire. They then drove to the station where the Essex coupé with the flat tire was parked. There the tire purchased by appellant was taken from his car and placed on the Essex coupé which had been left there two days before by La Rosa and Pasqua. During all of this time these defendants were under surveillance by the secret service agents.

La Rosa and appellant remained around the service station until dusk. La Rosa then proceeded in the direction of San Francisco in the Essex at a speed of approximately twelve miles an hour. Appellant remained seated at the wheel of his Studebaker sedan for approximately ten minutes after La Rosa left. He then followed La Rosa, catching up to him shortly. La Rosa, in the Essex, turned west at the intersection which connects with San Bruno and the Bayshore Highway. At this point appellant drove his car to the right of the Bayshore Highway, headed north, and stopped. Shortly thereafter appellant followed over the same road as the Essex. Half way between the Bayshore Highway and the Southern Pacific Railroad track appellant again stopped for approximately five minutes and kept looking back toward the Bayshore Highway over which he had just come. Appellant then proceeded to the El Camino Highway, where he turned north and caught up with the Essex by the Tanforan Race Track. Appellant at this point drove his car to the side of the highway and stopped there approximately five minutes, following which he again followed the Essex to the intersection of 19th avenue and Sloat boulevard in San Francisco, where both cars stopped, and as the secret service agent passed them at this point appellant and La Rosa were talking together. On account of the darkness and large amount of traffic at that point the agent lost sight of both cars.

In the early part of December appellant came alone to the Logan repair shop and said the Essex car had burned out a bearing and that he would bring it in, which later he did, and the bearing was replaced. Soon after, December 8th, appellant and another came for the car.

Mr. Geauque, a secret service agent, testified that about this same time he and a fellow officer saw Maugeri and Pasqua leave the La Salle Restaurant, this time in Pasqua's roadster, the same car which on the previous occasion on the 28th of November had been occupied by Maugeri and La Rosa and driven by the latter. Maugeri and Pasqua again went to Logan's repair shop, Pasqua driving the car. In the rear of the shop was the Essex car, which the officers had followed on November 30th and lost in the traffic. When they tried to back the car out of the shop, it was found to have a flat tire, which it was impossible to inflate. The appellant and Pasqua then went away and soon returned with a used tire which was placed on the Essex car and it was then driven away by Pasqua, Maugeri preceding him, driving the Buick car. Maugeri paid for all repairs on the Essex.

There was other evidence concerning the activities of appellant's codefendants in carrying out the conspiracy. Appellant objected to all of this evidence being received and later moved to strike it all from the record.

Appellant argues that because the court ruled out certain evidence which appears to be similar to evidence that was allowed to stand, all such evidence should have been excluded. This does not follow; we are not called upon to review the action of the District Court in refusing certain testimony. As to the evidence admitted, we hold that it was properly received and also that the motion to strike was properly denied.

It is also contended that the verdict of acquittal as to some of the counts is inconsistent with the verdict of guilty on the conspiracy count. This court has said, in Macklin v. U. S., 79 F.(2d) 756.

"The verdicts are not inconsistent, but had they been so, that fact, standing alone, would not render the verdict of guilty under the first count invalid. This court said, in Bilboa et al., v. U.S., 287 F. 125: 'It was the duty of the jury to return a verdict upon each count of the indictment, and the fact that it found the defendants not guilty on one count does not render conviction in the other invalid.' And the

Second Circuit has said, in Seiden v. U.S., 16 F.(2d) 197, 198: 'We have held that, when a jury convicts upon one count and acquits upon another the conviction will stand, though there is no rational way to reconcile the two conflicting conclusions.'"

 As to the requests for a directed verdict, it is well settled that, on motion for a directed verdict for the defendant in a criminal case, if there is any "proper," "legal," "competent," or "substantial" evidence sustaining the charge, it should be submitted to the jury.

In Abrams v. United States, 250 U.S. 616, 619, 40 S.Ct. 17, 18, 63 L.Ed. 1173, the court said:

"The claim chiefly elaborated upon by the defendants in the oral argument and in their brief is that there is no substantial evidence in the record to support the judgment upon the verdict of guilty and that the motion of the defendants for an instructed verdict in their favor was erroneously denied. A question of law is thus presented, which calls for an examination of the record, not for the purpose of weighing conflicting testimony, but only to determine whether there was some evidence, competent and substantial, before the jury, fairly tending to sustain the verdict. [Cases cited.]" See, also, Stilson v. United States, 250 U.S. 583, 588, 40 S.Ct. 28, 63 L.Ed. 1154; Pierce v. United States, 252 U.S. 239, 251, 252, 40 S.Ct. 205, 64 L.Ed. 542.

This court has consistently adhered to the above rule.

The late Judge Sawtelle said, in Crono v. United States (C.C.A.) 59 F.(2d) 339, 340:

"The duty of this court is 'but to declare whether the jury had the right to pass on what evidence there was.' * * * There being substantial evidence in support of both charges, the court would have erred if it had peremptorily directed an acquittal upon either of the counts." See, also, Vilson v. United States (C.C.A. 9) 61 F.(2d) 901.

In Pierce v. United States, 252 U.S. 239, 251, 40 S.Ct. 205, 210, 64 L.Ed. 542, the Supreme Court said: "There being 'substantial evidence in support of the charges, the court would have erred if it had peremptorily directed an acquittal upon any of the counts. The question whether the effect of the evidence was such as to overcome any reasonable doubt of guilt was for the jury, not the court, to decide."

 We hold that the evidence against the appellant was sufficient to take the case to the jury and that it substantially supports the verdict.

Affirmed.

WILBUR, Circuit Judge.

I dissent for the reason that there is no evidence that the defendant knew that his associates were passing counterfeit money. Proof of this fact is essential to establish complicity in the crime or conspiracy to commit the crime of passing counterfeit money. As said by the Supreme Court of California in People v. Dole, 122 Cal. 486, 492, 55 P. 581, 584, 68 Am.St.Rep. 50: "A person may aid in the commission of an offense by doing innocently some act essential to its accomplishment, and this is especially true in regard to the crime of forgery, for he may pass the forged instrument without knowing that it is forged. The word 'aid' does not imply guilty knowledge or felonious intent, whereas the definition of the word 'abet' includes knowledge of the wrongful purpose of the perpetrator and counsel and encouragement in the crime."